Barry I. Levy, Esq.
Michael A. Sirignano, Esq.
Frank P. Tiscione, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees
Insurance Company, GEICO Indemnity Company,
GEICO General Insurance Company and GEICO
Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE COMPANY and
GEICO CASUALTY COMPANY,

                Plaintiffs,

           -against-

ECLIPSE MEDICAL IMAGING, P.C., JACK
BALDASSARE, M.D., KENSINGTON RADIOLOGY
GROUP, P.C., STANLEY FRIEDMAN, M.D.,
RONALD SCHLIFTMAN, M.D., MICHAEL
SHAPIRO, M.D., KENSINGTON GROUP II INC.,
STANISLAV OCHILDIYEV, CARDENAL
MANAGEMENT CORP., ALBERT VAYNSHTEYN
a/k/a ALEX VAYNSHTEYN, YELENA
MAKSUMOV a/k/a YELENA VAYNSHTEYN, and
ROBERT MAKS a/k/a ROBERT MAKSUMOV,

                Defendants.
-----------------------------------------------------------------X

Docket No.: _____(    )

**Plaintiff Demands a Trial by Jury**

## <u>COMPLAINT</u>

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO

General Insurance Company and GEICO Casualty Company (collectively "GEICO" or "Plaintiffs"),

as and for their Complaint against Defendants, hereby allege as follows:

## NATURE OF THE ACTION

1.      This action seeks to recover more than $2,229,000.00 that Defendants wrongfully obtained from GEICO as part of a fraudulent scheme involving the submission of fraudulent insurance charges in the names of Eclipse Medical Imaging, P.C. ("Eclipse") and Kensington Radiology Group, P.C. ("Kensington Radiology")(collectively referred to herein as the "PC Defendants"), radiology professional corporations unlawfully owned and controlled by unlicensed laypersons in violation of New York law.

2.      Defendants Stanislav Ochildiyev ("Ochildiyev"), Albert Vaynshteyn a/k/a Alex Vaynshteyn ("A. Vaynshteyn"), Yelena Maksumov a/k/a Yelena Vaynshteyn ("Y. Vaynshteyn") and Robert Maks a/k/a Robert Maksumov ("Maks") devised a scheme to unlawfully own and control the PC Defendants, which both operated from 651 Coney Island Avenue, Brooklyn, New York (the "Coney Island Location"). Ochildiyev, A. Vaynshteyn, Y. Vaynshteyn and Maks are not licensed physicians, but essentially "bought" the licenses of Jack Baldassare, M.D. ("Baldassare"), Stanley Friedman, M.D. ("Friedman"), Ronald Schliftman, M.D. ("Schliftman") and Michael Shapiro, M.D. ("Shapiro") and employed them to be the sham owners of the PC Defendants in order to do indirectly what they would be forbidden from doing directly, namely controlling medical practices and siphoning the profits from the PC Defendants to themselves through improper financial and kickback arrangements.

3.      Defendants scheme involves the submission of voluminous charges to GEICO and other New York insurance companies for predetermined, illusory, and otherwise unreimbursable radiology services, including magnetic resonance imaging tests ("MRIs"), computerized tomography tests ("CTs"), and X-Rays (collectively "Radiology Services"), which allegedly are

provided to automobile accident victims insured by GEICO ("Insureds") and other New York automobile insurers.

4.     GEICO seeks to recover the monies that have been wrongfully obtained by Defendants and, further, seeks a declaration that it is not legally obligated to pay reimbursement of more than $1,980,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of the PC Defendants because:

(i)     the PC Defendants are unlawfully incorporated, unlawfully owned and controlled by non-medical professionals, and engage in a scheme involving unlawful fee splitting with non-medical professionals, which renders the PC Defendants ineligible to bill for or to collect no-fault benefits regardless of whether the Radiology Services are medically necessary;

(ii)     the PC Defendants have no right to receive payment for any pending bills submitted to GEICO because the Radiology Services fail to conform to the New York State Workers Compensation Fee Schedule and misrepresent the amount of reimbursement to which Defendants are entitled; and

(iii)     the Radiology Services are provided pursuant to the dictates of laypersons not licensed to render healthcare services and through the use of illegal kickback and referral arrangements.

5.     The Defendants fall into the following categories:

(i)     The PC Defendants are New York professional corporations through which the Radiology Services purportedly are performed and are billed to automobile insurance companies, including GEICO.

(ii)     Baldassare, Friedman, Schliftman, and Shapiro (collectively, "Nominal Owner Defendants") are physicians licensed to practice medicine in the State of New York who falsely purport to own Eclipse and Kensington Radiology.

(iii)     Defendants Ochildiyev, A. Vaynshteyn, Y. Vaynshteyn, Maks, Kensington Group II Inc. ("Kensington Group) and Cardenal Management Corp. ("Cardenal Management")(collectively, the "Management Defendants") secretly and unlawfully own, control and/or derive economic benefit from the PC Defendants in contravention of New York law.  Through their illegal ownership and/or control of the PC Defendants, the Management Defendants engage in collusive referral, kickback and fee-splitting arrangements that cause Insureds to be referred to the PC Defendants for the sole purpose of exploiting the Insureds' no-fault benefits.  The

3

Management Defendants are persons and/or entities who are not and never have been licensed healthcare professionals.

6.     As discussed in more detail throughout this complaint, Defendants at all relevant times have known that the: (i) PC Defendants are unlawfully incorporated and unlawfully owned and controlled by unlicensed laypersons; (ii) PC Defendants engage in a scheme involving unlawful fee splitting with unlicensed laypersons, rendering the PC Defendants ineligible to recover no-fault benefits; (iii) PC Defendants' billing for Radiology Services fail to conform to the New York State Workers' Compensation Fee Schedule and misrepresent the amount of reimbursement to which the PC Defendants are entitled; and (iv) Radiology Services are provided pursuant to the dictates of laypersons not licensed to render healthcare services and as a result of illegal kickback and referral arrangements.

7.     As such, Defendants do not now have – and never had – any right to be compensated for the services that have been billed to GEICO through the PC Defendants.

8.     The charts annexed hereto as Exhibits "1" and "2" sets forth a representative sample of the fraudulent claims that have been identified to-date that Defendants have submitted, or caused to be submitted, to GEICO.

9.     Defendants' fraudulent scheme began as early as 2015 and has continued uninterrupted through present day. As a result of Defendants' scheme, GEICO has incurred damages of more than $2,229,000.00.

## THE PARTIES

### I.     Plaintiffs

10.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska

corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

## II.    **Defendants**

11.    Defendant Kensington Radiology is an unlawfully incorporated New York medical professional corporation with its principal place of business at 651 Coney Island Avenue, Brooklyn, New York. Kensington Radiology was unlawfully incorporated on November 14, 2011, and was nominally owned on paper by Friedman, Schliftman, and Shapiro.

12.    Defendant Friedman resides in and is a citizen of New York. Friedman was licensed to practice medicine in New York on July 1, 1969 and purports to own Defendant Kensington Radiology along with Schliftman and Shapiro.

13.    Defendant Schliftman resides in and is a citizen of New York. Schliftman was licensed to practice medicine in New York on July 15, 1974 and purports to own Defendant Kensington Radiology along with Friedman and Shapiro.

14.    Defendant Shapiro resides in and is a citizen of New York. Shapiro was licensed to practice medicine in New York on July 14, 1978 and purports to own Defendant Kensington Radiology along with Schliftman and Friedman.

15.    Defendant Eclipse is an unlawfully incorporated New York medical professional corporation with its principal place of business at 651 Coney Island Avenue, Brooklyn, New York. Eclipse was unlawfully incorporated on December 29, 2016 and is nominally owned on paper by Baldassare.

16.    Defendant Kensington Group is a New York corporation with its principal place of business in New York. Kensington Group is not a licensed professional entity, and is owned and controlled by the Management Defendants, none of whom are licensed medical professionals, yet

they owned, controlled, and derived economic benefit from Kensington Radiology and Eclipse, and split fees with them, in contravention of New York Law.

17.     Defendant Cardenal Management is a New York corporation with its principal place of business in New York. Cardenal Management is not a licensed professional entity, and is owned and controlled by the Management Defendants, none of whom are licensed medical professionals.  Cardenal Management owned, controlled, and derived economic benefit from Kensington Radiology and Eclipse, and split fees with them, in contravention of New York Law.

18.     Defendant Ochildiyev resides in and is a citizen of New York. Ochildiyev has never been a licensed medical professional, yet owned, controlled, and derived economic benefit from the PC Defendants, and split fees with the PC Defendants, in contravention of New York Law.

19.     Defendant A. Vaynshteyn resides in and is a citizen of New York. A. Vaynshteyn has never been a licensed medical professional, yet owned, controlled, and derived economic benefit from the PC Defendants, and split fees with the PC Defendants, in contravention of New York Law.

20.     Defendant Y. Vaynshteyn resides in and is a citizen of New York. Y. Vaynshteyn has never been a licensed medical professional, yet owned, controlled, and derived economic benefit from the PC Defendants, and split fees with the PC Defendants, in contravention of New York Law.

21.     Defendant Maks resides in and is a citizen of New York. Maks has never been a licensed medical professional, yet owned, controlled, and derived economic benefit from the PC Defendants, and split fees with the PC Defendants, in contravention of New York Law.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

23.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.

24.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

25.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

### I.     An Overview of the No-Fault Laws and Licensing Statutes

26.     GEICO underwrites automobile insurance in New York.

27.     New York's no-fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

28.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services, including radiology services, physician services, chiropractic services, physical therapy services, and acupuncture services.

29.     An Insured can assign his/her right to No-Fault Benefits to health care goods and services providers in exchange for those services. Pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").  In the alternative, in New York, a healthcare services provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

30.     The No-Fault Laws obligate individuals and healthcare providers that seek payment of No-Fault Benefits to provide insurers with additional verification in order to establish proof of their claims.

31.     Pursuant to the No-Fault Laws, healthcare service providers are not eligible to bill for or to collect No-Fault Benefits if they fail to meet New York State or local licensing requirements necessary to provide the underlying services.

32.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet <u>any</u> applicable New York State or local licensing requirement necessary to perform such service in New York or meet <u>any</u> applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

33.    In <u>State Farm Mut. Auto. Ins. Co. v. Mallela</u>, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals made clear that healthcare providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

34.    In <u>Andrew Carothers, M.D., P.C. v. Progressive Ins. Co.</u>, 2019 N.Y. Slip Op. 04643 (June 11, 2019) the New York Court of Appeals reiterated that only licensed physicians may practice medicine in New York because of the concern that unlicensed physicians are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

35.    In New York, only a licensed healthcare professional may: (i) practice the pertinent healthcare profession; (ii) own and control a professional corporation authorized to operate a professional healthcare practice; (iii) employ and supervise other healthcare professionals; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from healthcare professional services.

36.    Unlicensed individuals may <u>not</u>: (i) practice the pertinent healthcare profession; (ii) own or control a professional corporation authorized to operate a professional healthcare practice; (iii) employ or supervise healthcare professionals; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from professional healthcare services.

37.    New York law prohibits licensed healthcare services providers from paying or accepting kickbacks in exchange for patient referrals. <u>See</u>, <u>e.g.</u>, New York Education Law §§ 6509-a; 6530(18); and 6531.

38.    Furthermore, pursuant to Education Law §6512 and §§6530 (11), (18), and (19), aiding and abetting an unlicensed person to practice a profession, offering any fee or consideration to a third party for the referral of a patient, and permitting any person not authorized to practice

medicine to share in the fees for professional services is considered a crime and/or professional misconduct.

39.    Pursuant to Education Law § 6509-a, it is professional misconduct under certain circumstances for a licensee to "directly or indirectly" request, receive, or participate in the division, transference, assignment, rebate, splitting, or refunding of a fee.  Further, pursuant to 8 N.Y.C.R.R. §29.1(b)(3) a licensee is precluded from "directly or indirectly" offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services. Pursuant to Education Law §6530(19), it is professional misconduct under certain circumstances for a licensee to permit any person to share in fees for professional services.

40.    New York law also prohibits anyone from engaging in, for profit, any business or service which in whole or in part includes the referring or recommending of persons to a physician, hospital, health related facility, or dispensary for any form of medical care or treatment.  See, New York Public Health Law §4501.  Similarly, no facility delivering health care services shall in any manner split fees with a medical referral service. See, New York Public Health Law §2811.

41.    Therefore, under the No-Fault Laws, a healthcare provider is not eligible to receive No-Fault Benefits if it is unlawfully incorporated, fraudulently licensed, if it permits unlicensed non-professionals to control or dictate the treatments rendered or allows them to share in the fees for the professional services, or if it pays or receives unlawful kickbacks in exchange for patient referrals.

42.    Pursuant to the New York No-Fault Laws, only healthcare services providers in possession of a direct assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone

other than the patient or his/her healthcare services provider. The implementing regulation adopted

by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or
> ... upon assignment by the applicant ... shall pay benefits directly to providers of
> healthcare services as covered under section five thousand one hundred two (a)(1)
> of the Insurance Law …

43.     Accordingly, for a healthcare services provider to be eligible to bill for and to collect

charges from an insurer for healthcare services pursuant to New York Insurance Law § 5102(a), it

must be the actual provider of the services. Under the New York no-fault insurance laws, a healthcare

services provider is not eligible to bill for services, or to collect for those services from an insurer,

where the services were rendered by persons who were not employees of the healthcare services

provider, such as independent contractors.

44.     In New York, claims for No-Fault Benefits are governed by the New York

Workers' Compensation Fee Schedule (the "Fee Schedule").

45.     When a healthcare services provider submits a claim for No-Fault Benefits using

the current procedural terminology ("CPT") codes set forth in the Fee Schedule, it represents that:

(i) the service described by the specific CPT code that is used was performed in a competent

manner in accordance with applicable laws and regulations; (ii) the service described by the

specific CPT code that is used was reasonable and medically necessary; and (iii) the service and

the attendant fee were not excessive.

46.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 Forms

submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified

by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or
> other person files an application for insurance or statement of claim containing any
> materially false information, or conceals for the purpose of misleading, information

concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.    Defendants' Fraudulent Scheme

47.    Beginning in 2015, Defendants masterminded and implemented a complex fraudulent scheme wherein the PC Defendants – owned on paper by the Nominal Owner Defendants, but actually illegally owned and controlled by the Management Defendants – were used to bill GEICO and the New York automobile insurance industry for millions of dollars in no-fault insurance benefits they were never entitled to receive.

48.    The Radiology Services are the byproduct of a scheme perpetrated by Defendants at the Coney Island Location which is illegally owned and controlled by unlicensed laypersons. To effectuate the scheme, the unlicensed laypersons "purchased" the licenses of healthcare professionals in order to fraudulently incorporate, own and/or control the PC Defendants.

### A.    Relevant Prior Lawsuits and Background

49.    The Management Defendants have a long and sordid history of involvement in no-fault insurance fraud schemes in which they have secretly and unlawfully owned and controlled numerous healthcare practices, including radiology practices, despite their lack of any healthcare license, and used them as vehicles to submit fraudulent no-fault insurance billing to automobile insurers.  The Management Defendants have used a revolving door of licensed professionals, including the Nominal Owners to perpetrate their fraudulent schemes.

50.    For example, each of the Management Defendants have been previously sued by New York automobile insurers claiming insurance fraud in connection with the illegal operation and management of unlawfully incorporated imaging practices.  See e.g., Government Employees Insurance Company, et al. v. Bakst, M.D., et al., 15-cv-00537 (ARR)(JO) (E.D.N.Y. 2015); Liberty Mutual Insurance Company, et al. v. Bakst, M.D., et al., 13-cv-04186

(WFK)(RML)(E.D.N.Y. 2013); 21st Century Insurance Company, et al. v. Professional Health Imaging, P.C., et al., 15683/2015 (Sup. Ct. New York County); Metropolitan Property and Casualty Insurance Company, et al. v. Stewart Roy Bakst, M.D., et al., 151362/2014 (Sup. Ct. Nassau County) (collectively referred as "Prior Actions").

51.    In the Prior Actions, the insurance companies accurately contended that the Management Defendants illegally controlled Professional Health Imaging, P.C. ("PHI"), Professional Health Radiology, P.C. ("PHR"), and Avenue C. Medical, P.C. ("Avenue C"), (the "First Generation Entities") among other professional corporations.

52.    For example, with respect to the First Generation Entities, the Management Defendants recruited licensed physicians, like the Nominal Owners, who were willing to "sell" their licenses so that they could continue to unlawfully own and control those professional corporations.  The First Generation Entities demonstrated no indicia of legitimate ownership, including the fact that (i) they did not market their names to the general public, (ii) they never sought to build name recognition to draw legitimate business instead relying on referrals from professional corporations that were controlled by the Management Defendants, and (iii) all decision-making authority relating to the professional entities were vested entirely with the Management Defendants, including control over the finances, the treatment protocols, the control over how the services would be billed to insurers and how the profits were dispersed.

53.    Additionally the Management Defendants caused the First Generation Entities to pay compensation to them in the "form" of rental payments and payments for alleged services that were not legitimate, arms-length payments, but instead were secured by the Management Defendants as part of "management" agreements that gave them a security interest in the PCs accounts.

54.     Furthermore, the Management Defendants had signatory authority to First Generation Entities' bank accounts that allowed them unfettered access to withdraw substantial sums of monies. Similar to the Coney Island Location, the Management Defendants filed numerous UCC liens for the medical equipment and leasehold improvements associated with the First Generation Entities, and secured liens by utilizing their healthcare insurance receivables as collateral.

55.     As with the PC Defendants, the Management Defendants illegal control of the First Generation Entities was effectuated by utilizing Maks to run and operate the professional entities and the associated location as the purported office manager.

56.     The Management Defendants scheme was eventually uncovered and they elected to move their operation from Avenue C to the Coney Island Location to begin a series of new fraudulent ventures involving the PC Defendants.

**B.     The Management Defendants' Control of the Coney Island Location**

57.     The Management Defendants, through a series of companies they have been associated with, have consistently maintained control of the Coney Island Location, purchased imaging equipment used at the location and operated and controlled a series of professional radiology corporations at the location over a number of years, including the PC Defendants.

58.     The radiology practices that have operated over the years at the Coney Island Location, including the PC Defendants, never marketed their "practices" to the general public, did not advertise for patients, and never sought to build name recognition to draw legitimate business or attract legitimate referral sources.

59.     The Management Defendants maintained control over the radiological practices at the Coney Island Location, including the PC Defendants, through a series of financial and kickback

agreements/arrangements with the various medical providers, that involved: (i) leasing of the imaging equipment; (ii) obtaining and causing the medical practices to utilize their referral sources for radiology prescriptions; and/or (iii) using non-medical staff and technicians that operated from and controlled the day to day operations of the location.

60.     The Management Defendants maintained a physical presence at the Coney Island Location so they could control the day to day operations. For example, after having served as office manager at the Avenue C facility, Maks became the office manager at the Coney Island Location.

61.     In order to conceal their true ownership of the radiology practices at the Coney Island Location, including the PC Defendants, and to claim an air of legitimacy to the unlawful arrangements, the Management Defendants held themselves out to the public and have been identified by individuals as the "administrators" or "managers" at the Coney Island Location.

62.     The Management Defendants caused all reading radiologists, including the Nominal Owners, to operate via tele-radiology to minimize the amount of time any of the licensed radiologists could spend at the Coney Island Location.

63.     The Management Defendants' physical presence at the Coney Island Location, along with the absence of physical presence by the licensed radiologists, allowed the Management Defendants to control the day to day operations of the Coney Island Location through the administrative staff they directed, without any genuine involvement by the licensed radiologists.

64.     Friedman, Schliftman and Shapiro have a long history with the Management Defendants.  More specifically, the Management Defendants, through the use of Kensington Group and Cardenal Management, among other entities, unlawfully owned and controlled Kensington Radiology, and Ochildiyev, A. Vaynshteyn, Y. Vaynshteyn and Maks recruited Friedman, Schliftman and Shapiro to pose as the sham or "paper" owners of Kensington Radiology.

**C.    The Unlawful Incorporation and Operation of Kensington Radiology**

65.    Having seen their insurance fraud scheme with the First Generation Entities and other professional entities become exposed, the Management Defendants "closed shop" and relocated to the Coney Island Location.

66.    In or about early 2015, the Management Defendants commenced a search for one or more licensed radiologists who would be willing to sell the use of a professional license to the Management Defendants so that the Management Defendants could: (i) fraudulently operate a medical professional corporation under the radiologist's name; (ii) utilize the equipment and office space at the Coney Island Location; (iii) split fees with the companies associated with Defendants; (iv) continue using the referral sources that the Management Defendants had arrangements with; and (v) submit large-scale fraudulent billing to New York automobile insurers, including GEICO.

67.    The Management Defendants did not have to search far for radiologists, as they knew Friedman, Schliftman and Shapiro were willing to engage in such a scheme and act as the nominal owners of Kensington Radiology. In fact, Friedman, Schliftman and Shapiro purportedly rendered medical services on behalf of some of the First Generation Entities.

68.    In order to circumvent New York law and to induce the New York State Education Department (the "Education Department") to continue authorizing Kensington Radiology to operate a medical practice, the Management Defendants entered into a secret scheme with Friedman, Schliftman and Shapiro.

69.    In exchange for compensation from the Management Defendants, Friedman, Schliftman and Shapiro agreed to falsely represent that they were the true shareholders, directors, and officers of Kensington Radiology and that they truly owned and controlled the professional

corporation. Friedman, Schliftman and Shapiro did this knowing that Kensington Radiology was going to be used to submit fraudulent billing to New York automobile insurers.

70. Once Kensington Radiology began operating from the Coney Island Location, Friedman, Schliftman and Shapiro ceded true beneficial ownership and control over the professional corporation to the Management Defendants.

71. The Management Defendants – rather than Friedman, Schliftman and Shapiro – provided all start-up costs and ongoing money to operate Kensington Radiology from the Coney Island Location.

72. The Management Defendants required Friedman, Schliftman and Shapiro and Kensington Radiology to enter into a series of agreements including for the use of the space, staff and/or equipment.

73. In addition, the Management Defendants filed UCC blanket liens for the medical equipment at the Coney Island Location listing Cardenal Management as the debtor.

74. Friedman, Schliftman and Shapiro did not market Kensington Radiology's practice to the general public, did not advertise for patients, did not engage in efforts to attract referral sources, never sought to build name recognition to draw legitimate business, and did virtually nothing as would be expected of the owners of a legitimate radiology "practice" to develop its reputation and attract patients.

75. The Management Defendants, rather than Friedman, Schliftman and Shapiro, created and controlled the referral sources and the patient base for Kensington Radiology's practice.

76.     Friedman, Schliftman and Shapiro never selected or controlled who provided administrative, management, collection, reception, transportation, and/or other services for Kensington Radiology.

77.     Similarly, Friedman, Schliftman and Shapiro never controlled the amounts billed to, or paid by, Kensington Radiology for administrative, management, collection, reception, transportation, and/or other services provided for or on behalf of Kensington Radiology.

78.     Friedman, Schliftman and Shapiro never were the true shareholders, directors, or officers of Kensington Radiology, and never had any true ownership interest in or control over the professional corporation. True ownership and control over Kensington Radiology always rested entirely with the Management Defendants, who used the facade of Kensington Radiology to do indirectly what they were forbidden from doing directly, namely: (i) employ medical professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

79.     In further support of the fact that the Management Defendants – not Friedman, Schliftman and Shapiro – owned and controlled Kensington Radiology, the Management Defendants received the bulk of the monies paid from the Kensington Radiology bank account. By way of example, the Management Defendants, through Kensington Group, was paid over 76% of the income that Kensington Radiology had realized, in sums ranging from $60,000.00 to $150,000.00 per month.

80.     Friedman, Schliftman and Shapiro exercised absolutely no control over or ownership interest in Kensington Radiology. All decision-making authority relating to the operation and management of Kensington Radiology was vested entirely with the Management Defendants.

81.     In addition, Friedman, Schliftman and Shapiro never controlled or maintained any of Kensington Radiology's books or records, including its bank accounts; never selected, directed,

and/or controlled any of the individuals or entities responsible for handling any aspect of Kensington Radiology's financial affairs; never hired or supervised any of Kensington Radiology's employees or independent contractors; and was completely unaware of fundamental aspects of how Kensington Radiology operated.

82.    The Management Defendants also arranged to have Kensington Radiology enter into various financial arrangements and agreements with themselves in order to conceal their true ownership and control of Kensington Radiology.

83.    While these agreements and arrangements ostensibly were created to permit the Management Defendants to provide services, or facility space and equipment, they were actually used solely as a tool to permit the Management Defendants to: (i) control the day-to-day operations, exercise supervisory authority over, and illegally own Kensington Radiology; and (ii) siphon all of the profits that were generated by the billings submitted to GEICO and other insurers through Kensington Radiology.

84.    The net effect of the agreements and financial arrangements between Defendants has been to maintain Kensington Radiology in a constant state of debt to the Management Defendants, thereby enabling the Management Defendants to maintain total control over the professional corporation, its accounts receivable, and any revenues that might be generated therefrom.

85.    The Management Defendants' unlawful ownership and control of Kensington Radiology compromised patient care, because the provision of health services through Kensington Radiology was entirely subject to the pecuniary interests of its non-medical professional owners, not the independent medical judgment of a true medical professional-owner.

**D.      The Unlawful Incorporation and Operation of Eclipse**

86.      Toward the end of 2016, the Management Defendants became concerned about their unlawful ownership and control of Kensington Radiology being exposed and saw the "writing on the wall".  In attempt to continue their fraudulent scheme, they took steps to replace Kensington Radiology with Eclipse.

87.      In or about January, 2017, as part of replacing Kensington Radiology, the Management Defendants needed another licensed radiologist to operate from the Coney Island Location who would be willing to: (i) let them control a medical professional corporation under the radiologist's name; (ii) utilize the equipment, non-medical staff and office space at the Coney Island Location; (iii) split fees with the companies associated with Defendants; (iv) continue using the referral sources that the Management Defendants had arrangements with; and (v) submit large-scale billing to GEICO and other insurers.

88.      As they had done with Friedman, Schliftman and Shapiro, the Management Defendants did not need to search far for a radiologist, as they had someone readily available who had a pre-existing relationship with them (i.e. Baldassare) as Baldassare had acted as a reading radiologist for Kensington Radiology.

89.      In order to circumvent New York law and to induce the Education Department to continue authorizing Eclipse to operate a medical practice, the Management Defendants entered into a secret scheme with Baldassare.

90.      In exchange for compensation from the Management Defendants, Baldassare agreed to falsely represent that he is the true shareholder, director, and officer of Eclipse and that he truly owns, and controls the professional corporation.  Baldassare did this knowing that Eclipse was going to be used to submit fraudulent billing to insurers.

91.    Once Eclipse began operating from the Coney Island Location in January 2017, Baldassare ceded true beneficial ownership and control over the professional corporation to the Management Defendants.

92.    In fact, Maks continued to be the office manager through the change from Kensington Radiology to Eclipse.

93.    As they had done with Friedman, Schliftman and Shapiro, the Management Defendants required Baldassare and Eclipse to enter into a series of agreements including for the use of the staff and equipment. In addition, Eclipse has an equipment lease arrangement with Kensington Realty Management Inc., a company, upon information and belief, which does not exist and is in actuality a shell company utilized by the Management Defendants.

94.    Like Friedman, Schliftman and Shapiro, Baldassare did not market Eclipse's practice to the general public, did not advertise for patients, did not engage in efforts to attract referral sources, never sought to build name recognition to draw legitimate business, and did virtually nothing as would be expected of the owner of a legitimate radiology "practice" to develop its reputation and attract patients.

95.    The Management Defendants, rather than Baldassare, created and controlled the referral sources and the patient base for Eclipse's practice.

96.    Baldassare never selected or controlled who provided administrative, management, collection, reception, transportation, and/or other services for Eclipse.

97.    Similarly, Baldassare never controlled the amounts billed to, or paid by, Eclipse for administrative, management, collection, reception, transportation, and/or other services provided for or on behalf of Eclipse.

98.     Baldassare is not the true shareholder, director, or officer of Eclipse, and does not have any true ownership interest in or control over the professional corporation. True ownership and control over Eclipse rests entirely with the Management Defendants, who use the facade of Eclipse to do indirectly what they are forbidden from doing directly, namely: (i) employ medical professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

99.     In further support of the fact that the Management Defendants – not Baldassare – own and control Eclipse, Baldassare has acknowledged the following under oath:

- He did not purchase the MRI equipment, scanner and x-ray equipment that was at the Coney Island Location prior to Eclipse operating there;

- It was basically a turnkey operation;

- Maks has a key to the Coney Island Location;

- Maks has access to the bank account of Eclipse; and

- Eclipse initially utilized a billing company owned by Maks.

100.    Baldassare exercises no control over or ownership interest in Eclipse. All decision-making authority relating to the operation and management of Eclipse is vested entirely with the Management Defendants.

101.    In addition, Baldassare does not control or maintain any of Eclipse's books or records, including its bank accounts; does not select, direct, and/or control any of the individuals or entities responsible for handling any aspect of Eclipse's financial affairs; does not hire or supervise any of Eclipse's employees or independent contractors; and is unaware of fundamental aspects of how Eclipse operates.

102.    As they had done with the other providers from the Coney Island Location, the Management Defendants caused the administrative staff to work for Eclipse so that they could control the day to day operations at the Coney Island Location.

103.    The Management Defendants also arranged to have Eclipse enter into various financial arrangements and agreements with themselves in order to conceal their true ownership and control of Eclipse.

104.    While these agreements and arrangements ostensibly are created to permit the Management Defendants to provide services, or facility space and equipment, they are actually used solely as a tool to permit the Management Defendants to: (i) control the day-to-day operations, exercise supervisory authority over, and illegally own Eclipse; and (ii) siphon all of the profits that are generated by the billings submitted to GEICO and other insurers through Eclipse.

105.    The net effect of the agreements and financial arrangements between Baldassare, Eclipse, and the Management Defendants has been to maintain Eclipse in a constant state of debt to the Management Defendants, thereby enabling the Management Defendants to maintain total control over the professional corporation, its accounts receivable, and any revenues that might be generated therefrom.

106.    The non-medical professional Management Defendants' unlawful ownership and control of Eclipse compromises patient care, because the provision of health services through Eclipse is entirely subject to the pecuniary interests of its non-medical professional owners, not the independent medical judgment of a true medical professional-owner.

### E.    The Illegal Kickback and Referral Relationships

107.    As part and parcel of the fraudulent scheme, the Management Defendants created, maintained, and controlled the referral sources and the patient base for the radiology practices that operated at the Coney Island Location.

108.    The record owners of the radiology practices that operated at the Coney Island Location, including the Nominal Owners, did nothing to create, maintain, or control the referral sources and the patient base for the radiology practices that operated at the Coney Island Location.

109.    The Management Defendants required the radiology practices that operated at the Coney Island Location, including the PC Defendants, to use the referral sources the Management Defendants had arrangements with.

110.    Regardless of the named entity or nominal owner of the professional corporation that operated from the Coney Island Location, the majority of the referral sources for the radiology prescriptions remained the same.

111.    For example, the radiology practices at the Coney Island Location have received radiology referrals from various medical providers that purportedly rendered services from the following no-fault clinic locations:

- 135 Eastern Parkway, Brooklyn, New York;

- 2273 65th Street, Brooklyn, New York;

- 410 Ditmas Avenue, Brooklyn, New York;

- 1942 Williamsbridge Road, Bronx, New York;

- 3209 Fulton Street, Brooklyn, New York;

- 1552 Ralph Avenue, Brooklyn, New York;

- 214-29 Jamaica Avenue, Queens, New York;

- 488 Lafayette Avenue, Brooklyn, New York;

- 1900 Ralph Avenue, Brooklyn, New York;

- 1835 Bay Ridge Parkway, Brooklyn, New York; and

- 573 McDonald Avenue, Brooklyn, New York.

112.    In keeping with the fact the referrals made to the PC Defendants were not based on any relationships/advertising/marketing performed by the Nominal Owners, Baldassare testified that Maks was responsible for creating the patient base and working with medical providers to refer patients to Eclipse for Radiology Services.

113.    Notably, the professionals who referred the majority of Insureds to the PC Defendants for Radiology Services have a significant history of insurance fraud.  For example, the following are relevant facts related to several of the primary referral sources:

- Albert Ciancimino, M.D. – significant history of (i) allowing unlicensed individuals to own and operate professional corporations he purportedly owned; (ii) engaging in illegal fee-splitting, kickbacks and referral arrangements; and (iii) submitting claims for healthcare services that were not medically necessary and were provided pursuant to predetermined fraudulent protocols designed by unlicensed laypersons for financial gain, not to treat or benefit the Insureds.

- Colin Clarke, M.D.  – significant history of referring patients for medically unnecessary testing that was subject to the direction of unlicensed individuals and prescribing durable medical equipment that was not necessary and prescribed pursuant to predetermined fraudulent protocols directed by unlicensed individuals.

- Ramy Hanna, M.D. – history of prescribing durable medical equipment that was not necessary and prescribed pursuant to predetermined fraudulent protocols directed by unlicensed individuals and illegal kickbacks.

- Viviane Etienne, M.D. and Yvette Davidov, D.O. – history of performing medically unnecessary and fictious testing pursuant to predetermined fraudulent protocols and illegal kickbacks for patient referrals and prescribed pain management drug products that were not necessary and prescribed pursuant to predetermined fraudulent protocols directed by unlicensed individuals and illegal kickbacks.

114.    Additional referring professionals include Sayeedus Salehin, M.D. ("Salehin") and Todd Lebson, D.C. ("Lebson"), both of whom have a significant history with the Management Defendants.  Upon information and belief:

- Both Salehin and Lebson allowed the Management Defendants to illegally own and control professional corporations they owned on paper, and were involved in illegal kickbacks and rendered medically unnecessary testing pursuant to predetermined fraudulent protocols at the direction of the Management Defendants.

- Salehin and Lebson, at the direction of the Management Defendants were referring Insureds to Kensington Radiology in exchange for kickbacks. Once the Management Defendants replaced Kensington Radiology with Eclipse, Salehin and Lebson began referring Insureds to Eclipse for Radiology Services in exchange for kickbacks.

- Lawsuits were brought against them, which resulted in the termination of the Management Defendants operations at numerous clinic locations, and thereafter, the Management Defendants directed Salehin and Lebson to begin operating from 410 Ditmas Avenue, Brooklyn, New York, a mere two blocks away from their original clinic location at 573 McDonald Avenue, Brooklyn, New York.

- The Management Defendants required Salehin and Lebson to open new practices in order to hide their fraudulent scheme. Currently, Salehin purportedly owns Brooklyn Medical Practice, P.C. and Lebson purportedly owns North Shore Family Chiropractic, P.C., both of which continue to refer Insureds to Eclipse for Radiology Services.

115.    Notably, Cardenal Management currently holds UCC liens at the 410 Ditmas Avenue location. Furthermore, checks from North Shore Family Chiropractic, P.C. that were made out to Brooklyn Medical Practice, P.C. for purported rent at the 410 Ditmas Avenue location were actually deposited into Cardenal Management's account. In addition, Y. Vaynshteyn and A. Vaynshteyn are purported employees at the 410 Ditmas Avenue location with A. Vaynshteyn serving as an office manager while Maks routinely visits the 410 Ditmas Avenue location, no doubt to obtain patients for Eclipse and continue Defendants illegal kickback and referral scheme.

116.    The unlawful kickback and referral arrangements were essential to the success of Defendants' fraudulent scheme. Defendants derived significant financial benefit from the relationships because without access to the Insureds, Defendants would not have the ability to bill GEICO and other insurers.

117.    Defendants at all times knew that the kickbacks and referral arrangements were illegal and, therefore, took affirmative steps to conceal the existence of the fraudulent referral scheme.

**F.    Defendants' Billing for Radiology Services Subject to Control by Laypersons**

118.    Defendants submitted voluminous bills to GEICO, and other New York automobile insurers, for Radiology Services that were subject to the control of the Management Defendants, who were unbound by the ethical rules governing the quality of care and the rules protecting against the exploitation of the patients for financial gain.

119.    The Management Defendants scheme included: (i) the performance of Radiology Services that were performed prematurely in proximity to the Insured's date of loss; (ii) the submission of bills for Radiology Services that did not comply with the New York Workers' Compensation Board Medical Treatment Guidelines; (iii) the submission of the bills that violated Ground Rule 3 established by the Radiology Section of the Fee Schedule ("Ground Rules"); and (iv) the submission of the bills that violated Ground Rule 7 of the Radiology Section Fee Schedule.

**i.    The Billing for Radiology Services in Violation of Ground Rule 7**

120.    In further support that the Management Defendants had true ownership and control over the PC Defendants, bills submitted by Defendants to GEICO for Radiology Services purportedly performed at the PC Defendants violated Section 7 of the Ground Rules established by the Radiology Section of the Fee Schedule. Section 7 provides:

> 7.  **Necessity of Services or Procedures**
>
> When a patient is referred to radiologists or other specialist for services covered in the Radiology section, they shall evaluate the patient's problem and determine if the services or procedures are medically necessary. Such evaluation and necessary consultation with the referring physician is an integral part of the professional component relative value unit and does not merit any additional charges.

121.    When an Insured was referred to the PC Defendants for Radiology Services, no physician from the PC Defendants evaluated the patient's problem to determine if the services or procedures were medically necessary, and no consultation with the referring healthcare provider was performed and no doctor from the PC Defendants was present to supervise the technicians that performed the MRIs, all in violation of the Radiology Ground Rules.

122.    Indeed, the Nominal Owners did not visit the Coney Island Location with any regularity and did not perform independent consultations or meaningfully oversee the technicians performing the services. In fact – and in violation of Section 7 – for the Radiology Services performed at the PC Defendants, the radiologist did not evaluate the patient's problems, did not consult with the referring physician, and did not see the patient in person.

123.    Indeed, Baldassare explained how he conducts his review of each patient's radiological scan, which does not include examining the patient or discussing the patient with the referring physician. In fact, Baldassare has stated under oath he was not even aware of Section 7 of the Radiology Ground Rules.

124.    Had the Nominal Owners been legitimate owners of the PC Defendants and not ceded ownership and control of the PC Defendants to the Management Defendants then the Nominal Owners would have been present at the PC Defendants on a frequent basis, would have provided genuine professional oversight of the radiology practices, and would have been in a position to either abide by or direct another physician to abide by the requirements of Section 7 of the rules established by the Radiology Section of the Fee Schedule.

### ii.     The Billing for Radiology Services in Violation of Ground Rule 3

125.     The Ground Rules set forth multiple requirements concerning billing for Radiology

Services. In particular, Ground Rule 3 provides that:

> A)     For two contiguous parts, the charge shall be the greater fee plus 50 percent of the lesser fee.
>
> B)     For two remote parts, the charge shall be the greater fee plus 75 percent of the lesser fee. Bilateral procedures are considered remote parts.
>
> C)     For three or more parts, whether contiguous or remote, the charge shall be the greatest fee plus 75 percent of the total of the lesser fees.

126.     Part and parcel of Defendants' fraudulent scheme, Defendants knowingly

submitted billing under the names of the PC Defendants in violation of Ground Rule 3 in an attempt

to maximize the profits of the professional corporations that they could siphon to themselves.

127.     For instance, when Kensington Radiology purported to provide multiple

Radiology Services on the same day, on the same Insured, they failed to apply the reduction in

fees required by Ground Rule 3.

128.     For example:

> (i)     Kensington Radiology billed GEICO for two Radiology Services purportedly provided to an Insured named "QC" on August 12, 2015. Kensington Radiology billed GEICO for a lumbar MRI  and lower extremity MRI purportedly performed on August 12, 2015, without reducing the lesser fee as required by Ground Rule 3.
>
> (ii)     Kensington Radiology billed GEICO for two Radiology Services purportedly provided to an Insured named "MG" on August 17, 2015. Kensington Radiology billed GEICO for a cervical MRI and a lumbar MRI purportedly performed on August 17, 2015, without reducing the lesser fee as required by Ground Rule 3.
>
> (iii)     Kensington Radiology billed GEICO for two Radiology Services purportedly provided to an Insured named "LB" on August 23, 2015. Kensington Radiology billed GEICO for a cervical MRI and a lumbar MRI purportedly performed on August 23, 2015, without reducing the lesser fee as required by Ground Rule 3.

(iv)  Kensington Radiology billed GEICO for two Radiology Services purportedly provided to an Insured named "PB" on May 28, 2015. Kensington Radiology billed GEICO for a cervical MRI and a lumbar MRI purportedly performed on May 28, 2015, without reducing the lesser fee as required by Ground Rule 3.

(v)  Kensington Radiology billed GEICO for two Radiology Services purportedly provided to an Insured named "SB" on April 14, 2015. Kensington Radiology billed GEICO for a cervical MRI and upper extremity MRI purportedly performed on April 14, 2015, without reducing the lesser fee as required by Ground Rule 3.

(vi)  Kensington Radiology billed GEICO for two Radiology Services purportedly provided to an Insured named "MC" on August 14, 2015. Kensington Radiology billed GEICO for a cervical MRI and an upper extremity MRI purportedly performed on August 14, 2015, without reducing the lesser fee as required by Ground Rule 3.

129.    Additionally, in an attempt to further circumvent the reduction in fees required by Ground Rule 3, Defendants routinely performed Radiology Services on separate, but proximate dates.

130.    For those Insureds that received some combination of lumbar, cervical, upper extremity, brain, and/or lower extremity MRIs at the PC Defendants, certain Insureds received these MRIs within seven days of each other.  If these MRIs are performed on the same day or within seven days of each other, the PC Defendants are required to bill GEICO at a reduced rate in accordance with the Fee Schedule.

131.    For example:

(i)  Kensington Radiology billed GEICO for three Radiology Services purportedly provided to an Insured named "BD" on August 3, 2015 and August 10, 2015. Kensington Radiology billed GEICO for a cervical MRI, lumbar MRI, and lower extremity MRI purportedly performed within 7 days of each other, without reducing the lesser fee as required by Ground Rule 3.

(ii)  Kensington Radiology billed GEICO for two Radiology Services purportedly provided to an Insured named "JG" on April 6, 2015 and April 10, 2015. Kensington Radiology billed GEICO for a cervical MRI and lumbar MRI

purportedly performed within 7 days of each other, without reducing the lesser fee as required by Ground Rule 3.

(iii)    Kensington Radiology billed GEICO for two Radiology Services purportedly provided to an Insured named "PA" on July 16, 2015 and July 20, 2015. Kensington Radiology billed GEICO for a lower extremity MRI and cervical MRI purportedly performed within 7 days of each other, without reducing the lesser fee as required by Ground Rule 3.

(iv)    Kensington Radiology billed GEICO for four Radiology Services purportedly provided to an Insured named "GH" on August 5, 2015 and August 9, 2015. Kensington Radiology billed GEICO for a lower extremity MRI, upper extremity MRI, cervical MRI and lumbar MRI purportedly performed within 7 days of each other, without reducing the lesser fee as required by Ground Rule 3.

(v)    Kensington Radiology billed GEICO for four Radiology Services purportedly provided to an Insured named "NH" on April 3, 2015 and April 8, 2015. Kensington Radiology billed GEICO for a cervical MRI, lumbar MRI, lower extremity MRI and upper extremity MRI purportedly performed within 7 days of each other, without reducing the lesser fee as required by Ground Rule 3.

(vi)    Kensington Radiology billed GEICO for three Radiology Services purportedly provided to an Insured named "AD" on March 22, 2015 and March 29, 2015. Kensington Radiology billed GEICO for an upper extremity MRI, cervical MRI and lumbar MRI purportedly performed within 7 days of each other, without reducing the lesser fee as required by Ground Rule 3.

(vii)    Kensington Radiology billed GEICO for two Radiology Services purportedly provided to an Insured named "KG" on June 24, 2015 and June 28, 2015. Kensington Radiology billed GEICO for a lower extremity MRI and upper extremity MRI purportedly performed within 7 days of each other, without reducing the lesser fee as required by Ground Rule 3.

(viii)    Kensington Radiology billed GEICO for two Radiology Services purportedly provided to an Insured named "DB" on October 4, 2015 and October 9, 2015. Kensington Radiology billed GEICO for a lumbar MRI and upper extremity MRI purportedly performed within 7 days of each other, without reducing the lesser fee as required by Ground Rule 3.

(ix)    Kensington Radiology billed GEICO for two Radiology Services purportedly provided to an Insured named "EF" on March 26, 2015 and March 31, 2015. Kensington Radiology billed GEICO for a cervical MRI and lower extremity MRI purportedly performed within 7 days of each other, without reducing the lesser fee as required by Ground Rule 3.

(x)    Kensington Radiology billed GEICO for two Radiology Services purportedly provided to an Insured named "EG" on August 17, 2015 and August 20, 2015. Kensington Radiology billed GEICO for an upper extremity MRI and lower

extremity MRI purportedly performed within 7 days of each other, without reducing the lesser fee as required by Ground Rule 3.

(xi)    Eclipse billed GEICO for two Radiology Services purportedly provided to an Insured named "FA" on December 3, 2018 and December 7, 2018. Eclipse billed GEICO for an upper extremity MRI and lower extremity MRI purportedly performed within 7 days of each other, without reducing the lesser fee as required by Ground Rule 3.

(xii)   Eclipse billed GEICO for two Radiology Services purportedly provided to an Insured named "AA" on July 26, 2018 and July 30, 2018. Eclipse billed GEICO for a cervical MRI and lumbar MRI purportedly performed within 7 days of each other, without reducing the lesser fee as required by Ground Rule 3.

(xiii)  Eclipse billed GEICO for two Radiology Services purportedly provided to an Insured named "DA" on July 2, 2019 and July 8, 2019. Eclipse billed GEICO for a cervical MRI and lumbar MRI purportedly performed within 7 days of each other, without reducing the lesser fee as required by Ground Rule 3.

(xiv)   Eclipse billed GEICO for two Radiology Services purportedly provided to an Insured named "BB" on February 26, 2020 and February 27, 2020. Eclipse billed GEICO for a cervical MRI and lumbar MRI purportedly performed within 7 days of each other, without reducing the lesser fee as required by Ground Rule 3.

(xv)    Eclipse billed GEICO for two Radiology Services purportedly provided to an Insured named "LC" on January 16, 2017 and January 23, 2017. Eclipse billed GEICO for a cervical MRI and lumbar MRI purportedly performed within 7 days of each other, without reducing the lesser fee as required by Ground Rule 3.

(xvi)   Eclipse billed GEICO for two Radiology Services purportedly provided to an Insured named "MC" on December 2, 2018 and December 7, 2018. Eclipse billed GEICO for an upper extremity MRI and lower extremity MRI purportedly performed within 7 days of each other, without reducing the lesser fee as required by Ground Rule 3.

(xvii)  Eclipse billed GEICO for two Radiology Services purportedly provided to an Insured named "SD" on May 12, 2017 and May 18, 2017. Eclipse billed GEICO for a cervical MRI and lumbar MRI purportedly performed within 7 days of each other, without reducing the lesser fee as required by Ground Rule 3.

(xviii) Eclipse billed GEICO for two Radiology Services purportedly provided to an Insured named "NB" on August 22, 2019 and August 28, 2019. Eclipse billed GEICO for a cervical MRI and lumbar MRI purportedly performed within 7 days of each other, without reducing the lesser fee as required by Ground Rule 3.

(xix)   Eclipse billed GEICO for two Radiology Services purportedly provided to an Insured named "RD" on July 25, 2017 and July 28, 2017. Eclipse billed GEICO for

an upper extremity MRI and lower extremity MRI purportedly performed within 7 days of each other, without reducing the lesser fee as required by Ground Rule 3.

(xx)    Eclipse billed GEICO for two Radiology Services purportedly provided to an Insured named "RC" on August 3, 2018 and August 10, 2018. Eclipse billed GEICO for a cervical MRI and lumbar MRI purportedly performed within 7 days of each other, without reducing the lesser fee as required by Ground Rule 3.

132.    In further support that the Radiology Services were purposefully and fraudulently separated into multiple dates of service in order to avoid the reduction by Ground Rule 3, there was no legitimate reason to purportedly perform multiple Radiology Services on the same Insured on separate days.

133.    Defendants purposefully submitted fraudulent bills to GEICO and other insurers that separated Radiology Services that should have been performed on a single day into multiple days in order to avoid the reduction of charges required by Ground Rule 3.

### iii.    The Billing for Radiology Services in Violation of the Treatment Guidelines

134.    In addition to violating the Ground Rules, Defendants systemically billed in violation of the New York Workers' Compensation Board Medical Treatment Guidelines ("Treatment Guidelines").

135.    In December 2010, the New York State Workers' Compensation Board implemented a program of Treatment Guidelines. The program included four comprehensive, evidence-based guidelines for the treatment of injuries and illnesses involving the neck, back, shoulder and knee. These guidelines were the mandatory standard of care for dates of service on or after December 1, 2010 with updated versions of the Treatment Guidelines effective for dates of treatment on or after December 15, 2014.

136.    According to the Treatment Guidelines for the middle and lower back, MRIs are not recommended for acute back pain or acute radicular pain syndromes in the first 6 weeks, in the absence of red flags.

137.    Nevertheless, the PC Defendants routinely performed MRIs on Insureds within the first six weeks of the date of accident.

138.    For example:

(i)    On September 16, 2015 an Insured named "EA" was injured in a motor vehicle accident. Notwithstanding the Treatment Guidelines, Kensington Radiology billed GEICO for a lumbar MRI that was purportedly performed on October 15, 2015, which is less than 6 weeks after the date of accident.

(ii)    On October 27, 2015 an Insured named "RB" was injured in a motor vehicle accident. Notwithstanding the Treatment Guidelines, Kensington Radiology billed GEICO for a lumbar MRI that was purportedly performed on November 24, 2015, which is less than 6 weeks after the date of accident.

(iii)    On April 7, 2015 an Insured named "JC" was injured in a motor vehicle accident. Notwithstanding the Treatment Guidelines, Kensington Radiology billed GEICO for a lumbar MRI that was purportedly performed on May 5, 2015, which is less than 6 weeks after the date of accident.

(iv)    On August 2, 2015 an Insured named "IC" was injured in a motor vehicle accident. Notwithstanding the Treatment Guidelines, Kensington Radiology billed GEICO for a thoracic MRI that was purportedly performed on August 27, 2015, which is less than 6 weeks after the date of accident.

(v)    On October 20, 2015 an Insured named "FE" was injured in a motor vehicle accident. Notwithstanding the Treatment Guidelines, Kensington Radiology billed GEICO for a thoracic MRI that was purportedly performed on November 11, 2015, which is less than 6 weeks after the date of accident.

(vi)    On October 14, 2015 an Insured named "DH" was injured in a motor vehicle accident. Notwithstanding the Treatment Guidelines, Kensington Radiology billed GEICO for a lumbar MRI that was purportedly performed on November 12, 2015, which is less than 6 weeks after the date of accident.

(vii)    On February 13, 2015 an Insured named "CM" was injured in a motor vehicle accident. Notwithstanding the Treatment Guidelines, Kensington Radiology billed GEICO for a lumbar MRI that was purportedly performed on March 11, 2015, which is less than 6 weeks after the date of accident.

(viii)    On July 23, 2015 an Insured named "CP" was injured in a motor vehicle accident. Notwithstanding the Treatment Guidelines, Kensington Radiology billed GEICO for a lumbar MRI that was purportedly performed on August 22, 2015, which is less than 6 weeks after the date of accident.

(ix)    On May 9, 2015 an Insured named "CR" was injured in a motor vehicle accident. Notwithstanding the Treatment Guidelines, Kensington Radiology billed GEICO for a lumbar MRI that was purportedly performed on June 7, 2015, which is less than 6 weeks after the date of accident.

(x)    On July 21, 2015 an Insured named "SS" was injured in a motor vehicle accident. Notwithstanding the Treatment Guidelines, Kensington Radiology billed GEICO for a lumbar MRI that was purportedly performed on August 17, 2015, which is less than 6 weeks after the date of accident.

(xi)    On April 25, 2017 an Insured named "GA" was injured in a motor vehicle accident. Notwithstanding the Treatment Guidelines, Eclipse billed GEICO for a lumbar MRI that was purportedly performed on May 23, 2017, which is less than 6 weeks after the date of accident.

(xii)    On October 22, 2019 an Insured named "FA" was injured in a motor vehicle accident. Notwithstanding the Treatment Guidelines, Eclipse billed GEICO for a lumbar MRI that was purportedly performed on November 20, 2019, which is less than 6 weeks after the date of accident.

(xiii)    On December 4, 2019 an Insured named "FD" was injured in a motor vehicle accident. Notwithstanding the Treatment Guidelines, Eclipse billed GEICO for a lumbar MRI that was purportedly performed on December 27, 2019, which is less than 6 weeks after the date of accident.

(xiv)    On February 8, 2019 an Insured named "JG" was injured in a motor vehicle accident. Notwithstanding the Treatment Guidelines, Eclipse billed GEICO for a lumbar MRI that was purportedly performed on March 8, 2019, which is less than 6 weeks after the date of accident.

(xv)    On April 24, 2019 an Insured named "MC" was injured in a motor vehicle accident. Notwithstanding the Treatment Guidelines, Eclipse billed GEICO for a lumbar MRI that was purportedly performed on May 14, 2019, which is less than 6 weeks after the date of accident.

(xvi)    On June 9, 2019 an Insured named "SH" was injured in a motor vehicle accident. Notwithstanding the Treatment Guidelines, Eclipse billed GEICO for a lumbar MRI that was purportedly performed on July 7, 2019, which is less than 6 weeks after the date of accident.

(xvii)    On March 26, 2018 an Insured named "RJ" was injured in a motor vehicle accident. Notwithstanding the Treatment Guidelines, Eclipse billed GEICO for a lumbar MRI that was purportedly performed on April 24, 2018, which is less than 6 weeks after the date of accident.

(xviii)  On March 12, 2019 an Insured named "IK" was injured in a motor vehicle accident. Notwithstanding the Treatment Guidelines, Eclipse billed GEICO for a lumbar MRI that was purportedly performed on March 28, 2019, which is less than 6 weeks after the date of accident.

(xix)  On March 31, 2019 an Insured named "JM" was injured in a motor vehicle accident. Notwithstanding the Treatment Guidelines, Eclipse billed GEICO for a lumbar MRI that was purportedly performed on April 27, 2017, which is less than 6 weeks after the date of accident.

(xx)  On December 24, 2019 an Insured named "GF" was injured in a motor vehicle accident. Notwithstanding the Treatment Guidelines, Eclipse billed GEICO for a lumbar MRI that was purportedly performed on January 23, 2020, which is less than 6 weeks after the date of accident.

139.  These are only representative examples. In many of the bills submitted by Defendants to GEICO for MRIs performed on Insureds, the Radiology Services were provided within the first 6 weeks of the Insureds' accidents.

**iv.  The Billing for Radiology Services Without Conservative Treatment**

140.  Defendants' ability to bill GEICO and other automobile insurers for the Radiology Services depended upon their ability to gain access to Insureds.

141.  However, in the claims identified in Exhibits "1" and "2", the substantial majority of the Insureds had been involved in relatively minor, low-speed, low-impact "fender-bender" accidents.

142.  In keeping with the fact that the Insureds within the claims identified in Exhibits "1" and "2" typically were involved in only minor accidents, in many of the claims identified in Exhibits "1" and "2" the Insureds did not seek treatment at any hospital after their minor accidents.

143.  To the extent that the Insureds in the claims identified in Exhibits "1" and "2" did seek treatment at a hospital as a result of their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way the same day with, at most, a minor sprain, strain, or similar soft tissue injury diagnosis.

144. To the extent that the Insureds in the claims identified in Exhibits "1" and "2" had any injuries at all as the result of an automobile accident, the injuries virtually always were garden-variety, minor soft tissue injuries such as sprains and strains.

145. In a legitimate clinical setting, MRIs should not be used as an initial form of diagnostic testing in the treatment of patients complaining of soft tissue injuries such as sprains or strains secondary to automobile accidents.

146. For example, the American College of Radiology – an almost 100 year-old professional organization with a mission to serve patients and society by empowering members to advance the practice, science and professions of radiological care – has indicated that MRIs usually are not appropriate as a first-line diagnostic tool in the treatment of patients complaining of soft tissue injuries secondary to automobile accidents.

147. Along similar lines, the American College of Physicians – a more than 100 year-old professional organization with a mission to enhance the quality and effectiveness of health care by fostering excellence and professionalism in the practice of medicine – likewise has indicated that MRIs usually are not appropriate as a first-line diagnostic tool in the treatment of patients complaining of soft tissue injuries secondary to automobile accidents.

148. In fact, in a legitimate clinical setting, patients suffering from soft tissue injuries such as strains or sprains secondary to automobile accidents generally should not receive MRIs until they receive at least four to eight weeks of conservative treatment.

149. This is because the substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of weeks through conservative treatment, or no treatment at all, and unnecessary diagnostic imaging can be counterproductive and can even be harmful to the patient.

150.     Even so, in order to generate a steady stream of referrals and to obtain additional ill-gotten gains, the PC Defendants, as directed by the Management Defendants, routinely purported to perform and/or provide MRIs to Insureds as an initial form of diagnostic testing, soon after the Insureds' underlying automobile accidents. This, despite the fact that the Insureds had not suffered injuries that would warrant MRIs, and – in any case – had not, and could not have, legitimately tried and failed a course of conservative treatment at the time when the MRIs purportedly were provided.

151.     For example:

(i)     On August 31, 2015 an Insured named "SF" was involved in a minor automobile accident. To the extent that "SF" experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Kensington Radiology purported to provide, and billed GEICO for a cervical MRI on September 10, 2015, which was before "SF" had a chance to complete any legitimate course of conservative treatment.

(ii)     On November 10, 2015 an Insured named "DG" was involved in a minor automobile accident. To the extent that "DG" experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Kensington Radiology purported to provide, and billed GEICO for a cervical MRI on November 20, 2015, which was before "DG" had a chance to complete any legitimate course of conservative treatment.

(iii)     On September 5, 2015 an Insured named "DL" was involved in a minor automobile accident. To the extent that "DL" experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Kensington Radiology purported to provide, and billed GEICO for a cervical MRI on September 17, 2015, which was before "DL" had a chance to complete any legitimate course of conservative treatment.

(iv)     On October 4, 2015 an Insured named "AP" was involved in a minor automobile accident. To the extent that "AP" experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Kensington Radiology purported to provide, and billed GEICO for a cervical MRI on October 15, 2015, which was before "AP" had a chance to complete any legitimate course of conservative treatment.

(v)     On April 14, 2015 an Insured named "RC" was involved in a minor automobile accident. To the extent that "RC" experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Kensington Radiology purported to provide, and billed GEICO for a cervical MRI on April 26, 2015, which was before "RC" had a chance to complete any legitimate course of conservative treatment.

(vi)    On March 16, 2015 an Insured named "AG" was involved in a minor automobile accident. To the extent that "AG" experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Kensington Radiology purported to provide, and billed GEICO for a cervical MRI on March 31, 2015, which was before "AG" had a chance to complete any legitimate course of conservative treatment.

(vii)   On November 2, 2015 an Insured named "LF" was involved in a minor automobile accident. To the extent that "LF" experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Kensington Radiology purported to provide, and billed GEICO for a cervical MRI on November 19, 2015, which was before "LF" had a chance to complete any legitimate course of conservative treatment.

(viii)  On August 13, 2015 an Insured named "GG" was involved in a minor automobile accident. To the extent that "GG" experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Kensington Radiology purported to provide, and billed GEICO for a cervical MRI on August 27, 2015, which was before "GG" had a chance to complete any legitimate course of conservative treatment.

(ix)    On September 10, 2015 an Insured named "CG" was involved in a minor automobile accident. To the extent that "CG" experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Kensington Radiology purported to provide, and billed GEICO for a cervical MRI on September 25, 2015, which was before "CG" had a chance to complete any legitimate course of conservative treatment.

(x)     On November 2, 2015 an Insured named "LL" was involved in a minor automobile accident. To the extent that "LL" experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Kensington Radiology purported to provide, and billed GEICO for a cervical MRI on November 16, 2015, which was before "LL" had a chance to complete any legitimate course of conservative treatment.

(xi)     On April 15, 2017 an Insured named "BV" was involved in a minor automobile accident. To the extent that "BV" experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Eclipse purported to provide, and billed GEICO for a cervical MRI on April 21, 2017, which was before "BV" had a chance to complete any legitimate course of conservative treatment.

(xii)    On August 31, 2018 an Insured named "VM" was involved in a minor automobile accident. To the extent that "VM" experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Eclipse purported to provide, and billed GEICO for a cervical MRI on September 14, 2018, which was before "VM" had a chance to complete any legitimate course of conservative treatment.

(xiii)   On January 6, 2019 an Insured named "AG" was involved in a minor automobile accident. To the extent that "AG" experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Eclipse purported to provide, and billed GEICO for a cervical MRI on January 22, 2019, which was before "AG" had a chance to complete any legitimate course of conservative treatment.

(xiv)    On January 1, 2017 an Insured named "PS" was involved in a minor automobile accident. To the extent that "PS" experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Eclipse purported to provide, and billed GEICO for a cervical MRI on January 18, 2017, which was before "PS" had a chance to complete any legitimate course of conservative treatment.

(xv)     On March 8, 2017 an Insured named "CO" was involved in a minor automobile accident. To the extent that "CO" experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Eclipse purported to provide, and billed GEICO for a cervical MRI on March 26, 2017, which was before "CO" had a chance to complete any legitimate course of conservative treatment.

(xvi)    On January 3, 2018 an Insured named "MP" was involved in a minor automobile accident. To the extent that "MP" experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Eclipse purported to provide, and billed GEICO for a lumbar MRI on January 22, 2018, which was before "MP" had a chance to complete any legitimate course of conservative treatment.

(xvii)   On November 9, 2018 an Insured named "BI" was involved in a minor automobile accident. To the extent that "BI" experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Eclipse purported to provide, and billed GEICO for a cervical MRI on November 30, 2018, which was before "BI" had a chance to complete any legitimate course of conservative treatment.

(xviii)   On May 5, 2019 an Insured named "MC" was involved in a minor automobile accident. To the extent that "MC" experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Eclipse purported to provide, and billed GEICO for a cervical MRI on May 28, 2019, which was before "MC" had a chance to complete any legitimate course of conservative treatment.

(xix)   On August 24, 2017 an Insured named "PJ" was involved in a minor automobile accident. To the extent that "PJ" experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Eclipse purported to provide, and billed GEICO for a cervical MRI on September 18, 2017, which was before "PJ" had a chance to complete any legitimate course of conservative treatment.

(xx)   On October 6, 2018 an Insured named "CN" was involved in a minor automobile accident. To the extent that "CN" experienced any health issues at all as the result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Eclipse purported to provide, and billed GEICO for a cervical MRI on October 31, 2018, which was before "CN" had a chance to complete any legitimate course of conservative treatment.

152.   The submission of inflated billing by Defendants, and the Nominal Owners' lack of involvement in evaluating whether the services provided were medically necessary, demonstrates the services performed by the PC Defendants were motivated by the improper financial arrangements and Management Defendants' control, which were designed to focus on maximizing profits.

153.   Defendants' scheme not only unlawfully enriched Defendants, but compromised patient care as the PC Defendants' operations were subject to pecuniary interests of the Management Defendants, not to the independent medical judgment of a true doctor-owner.

### III.    The Fraudulent Billing Defendants Submitted or Caused to be Submitted to GEICO

154.    To support their fraudulent charges, Defendants systematically submitted or caused to be submitted NF-3 forms, HCFA-1500 forms, and/or treatment reports through the PC Defendants to GEICO seeking payment for the Radiology Services for which Defendants are not entitled to receive payment.

155.    The NF-3 forms, HCFA-1500 forms and treatment reports that Defendants submitted or caused to be submitted to GEICO were false and misleading in the following material respects:

(i)    The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresent to GEICO that the PC Defendants are lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the PC Defendants are not properly licensed in that they are medical professional corporations that are unlawfully incorporated and unlawfully owned and controlled by, and split fees with, the Management Defendants, who are not licensed medical professionals.

(ii)    The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the PC Defendants uniformly misrepresent to GEICO that the PC Defendants are in compliance with the New York State Workers Compensation Fee Schedule and misrepresent the amount of reimbursement to which Defendants are entitled, in order to inflate the bills.

(iii)    The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresent to GEICO that the PC Defendants are lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the PC Defendants are not eligible to seek or pursue collection of No-Fault Benefits associated with the Radiology Services because the services are provided pursuant to illegal kickback and referral arrangements amongst Defendants and others.

### IV.    Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

156.    Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

157.    To induce GEICO to promptly pay the fraudulent charges for the Radiology Services, Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

158.    Specifically, they knowingly misrepresented and concealed facts related to the PC Defendants in an effort to prevent discovery that the PC Defendants are unlawfully incorporated and unlawfully split fees with unlicensed persons.

159.    Defendants also knowingly misrepresented and concealed facts to prevent GEICO from discovering that their charges failed to conform to the New York Workers Compensation Fee Schedule and were designed to maximize the charges submitted to GEICO and that the Radiology Services were performed in order to exploit the patients for financial gain.

160.    In addition, Defendants knowingly misrepresented and concealed facts related to the Provider Defendants in an effort to prevent discovery of the fact that Defendants unlawfully exchanged kickbacks for patient referrals.

161.    GEICO maintains standard office practices and procedures that are designed to and do ensure that No-Fault claim denial forms or requests for additional verification of No-Fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

162.    In accordance with the No-Fault Laws, and GEICO's standard office practices and procedures, GEICO either: (i) timely and appropriately denied the pending claims for No-Fault Benefits submitted through Defendants; or (ii) timely issued requests for additional verification with respect to all of the pending claims for No-Fault Benefits submitted through Defendants (yet GEICO failed to obtain compliance with the requests for additional verification), and, therefore, GEICO's time to pay or deny the claims has not yet expired.

163.    Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

164.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $2,229,000.00 based upon the fraudulent charges.

165.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## FIRST CAUSE OF ACTION
### Against Defendants
### (Declaratory Judgment, 28 U.S.C. §§ 2201 and 2202)

166.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

167.    There is an actual case in controversy between GEICO and the PC Defendants regarding more than $1,980,000.00 in fraudulent billing for the Radiology Services that has been submitted to GEICO under the names of the PC Defendants.

168.    The PC Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of the PC Defendants because the PC Defendants are unlawfully incorporated, secretly and unlawfully owned and controlled by unlicensed individuals and entities, and unlawfully splits fees with them.

169.    The PC Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of the PC Defendants because the bills misrepresent that the

PC Defendants are in compliance with the New York State Workers Compensation Fee Schedule and misrepresent the amount of reimbursement to which Defendants are entitled, in order to inflate the bills.

170.    The PC Defendants have no right to receive payment for any pending bills submitted to GEICO under the name of the PC Defendants because the Radiology Services purportedly provided by the PC Defendants are provided pursuant to illegal kickback and referral arrangements amongst Defendants and others.

171.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of the PC Defendants.

**SECOND CAUSE OF ACTION**
**Against Friedman, Schliftman, Shapiro, and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

172.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

173.    Kensington Radiology is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

174.    Friedman, Schliftman, Shapiro, and the Management Defendants knowingly conducted and/or participated, directly or indirectly, in the conduct of Kensington Radiology's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Kensington Radiology was not eligible to receive under the New York No-Fault insurance laws because: (i) it was unlawfully owned and controlled by unlicensed laypersons; (ii) it engaged in a

scheme to defraud involving kickbacks, fee-splitting and illegal referral arrangements with unlicensed laypersons; (iii) the billed-for-services were performed and billed in order to exploit the patients for financial gain; and (iv) the billed-for-services failed to conform to the Fee Schedule and misrepresented the amount of reimbursement to which Kensington Radiology was entitled. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

175.    Kensington Radiology's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Friedman, Schliftman, Shapiro, and the Management Defendants operated Kensington Radiology, insofar as Kensington Radiology was not engaged in a legitimate radiology practice, and therefore, acts of mail fraud are essential in order for Kensington Radiology to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Defendants continue to attempt collection on the fraudulent billing submitted by Kensington Radiology to the present day.

176.    Kensington Radiology is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Kensington Radiology in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

177.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $471,000.00 pursuant to the fraudulent bills submitted through Kensington Radiology.

178.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## THIRD CAUSE OF ACTION
### Against Friedman, Schliftman, Shapiro, and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(d))

179.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

180.    Kensington Radiology is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

181.    Friedman, Schliftman, Shapiro, and the Management Defendants are owners of, employed by, or associated with the Kensington Radiology enterprise.

182.    Friedman, Schliftman, Shapiro, and the Management Defendants knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Kensington Radiology's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Kensington Radiology was not eligible to receive under the New York no-fault insurance laws because: (i) it was unlawfully owned and controlled by unlicensed laypersons; (ii) it engaged in a scheme to defraud involving kickbacks, fee-splitting and illegal referral arrangements with unlicensed laypersons; (iii) the billed-for-services were performed and billed in order to exploit the patients for financial gain; and (iv) the billed-for-services failed to conform to the Fee Schedule and misrepresented the amount of reimbursement to which Kensington Radiology was entitled. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering

activity identified through the date of this Complaint are described, in part, in the chart annexed

hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

183.    Friedman, Schliftman, Shapiro, and the Management Defendants knew of, agreed to,

and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other

insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

184.    GEICO has been injured in its business and property by reason of the above-

described conduct in that it has paid at least $471,000.00 pursuant to the fraudulent bills submitted

through Kensington Radiology.

185.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable

attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### FOURTH CAUSE OF ACTION
**Against Kensington Radiology, Friedman, Schliftman, Shapiro, and the Management
Defendants (Common Law Fraud)**

186.    GEICO incorporates, as though fully set forth herein, each and every allegation in

the paragraphs set forth above.

187.    Kensington Radiology, Friedman, Schliftman, Shapiro, and the Management

Defendants intentionally and knowingly made false and fraudulent statements of material fact to

GEICO and concealed material facts from GEICO in the course of their submission of hundreds of

fraudulent bills seeking payment for the Radiology Services.

188.    The false and fraudulent statements of material fact and acts of fraudulent

concealment include: (i) in every claim, the representation that Kensington Radiology was properly

licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1)

and 11 NYCRR § 65-3.16(a)(12), when in fact it was unlawfully owned and controlled by non-

medical professionals, and engaged in a scheme involving illegal fee splitting, kickback and referral

49

arrangements with them; (ii) in every claim, the representation that the billed-for-services were proper and properly billed, when in fact the billed-for-services were performed and billed in order to exploit the patients for financial gain; and (iii) that Kensington Radiology was in compliance and conformed to the New York Workers Compensation Fee Schedule, when in fact, Kensington Radiology failed to conform to the New York Workers Compensation Fee Schedule and misrepresented the amount of reimbursement to which Kensington Radiology was entitled.

189.    Kensington Radiology, Friedman, Schliftman, Shapiro, and the Management Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Kensington Radiology that were not compensable under the No-Fault Laws.

190.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $471,000.00 pursuant to the fraudulent bills submitted by Defendants through Kensington Radiology.

191.    Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

192.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**Against Kensington Radiology, Friedman, Schliftman, Shapiro, and the Management Defendants**
**(Unjust Enrichment)**

193.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

194.    As set forth above, Kensington Radiology, Friedman, Schliftman, Shapiro, and the Management Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

195.    When GEICO paid the bills and charges submitted by or on behalf of Kensington Radiology for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

196.    Kensington Radiology, Friedman, Schliftman, Shapiro, and the Management Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

197.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

198.    By reason of the above, Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $471,000.00.

## SIXTH CAUSE OF ACTION
### Against Baldassare and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

199.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

200.    Eclipse is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

201.    Baldassare and the Management Defendants knowingly conducted and/or participated, directly or indirectly, in the conduct of Eclipse's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341,

based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Eclipse is not eligible to receive under the New York no-fault insurance laws because: (i) it is unlawfully owned and controlled by unlicensed laypersons; (ii) it engages in a scheme to defraud involving kickbacks, fee-splitting and illegal referral arrangements with unlicensed laypersons; (iii) the billed-for-services are performed and billed in order to exploit the patients for financial gain; and (iv) the billed-for-services fail to conform to the Fee Schedule and misrepresent the amount of reimbursement to which Eclipse is entitled. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

202.    Eclipse's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Baldassare, and the Management Defendants operated Eclipse, insofar as Eclipse was not engaged in a legitimate radiology practice, and therefore, acts of mail fraud are essential in order for Eclipse to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Defendants continue to submit and attempt collection on the fraudulent billing submitted by Eclipse to the present day.

203.    Eclipse is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Eclipse in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

204.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,758,000.00 pursuant to the fraudulent bills submitted through Eclipse.

205.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### SEVENTH CAUSE OF ACTION
**Against Baldassare and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

206.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

207.    Eclipse is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

208.    Baldassare and the Management Defendants are owners of, employed by, or associated with the Eclipse enterprise.

209.    Baldassare and the Management Defendants knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Eclipse's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Eclipse was not eligible to receive under the New York no-fault insurance laws because: (i) it is unlawfully owned and controlled by unlicensed laypersons; (ii) it engages in a scheme to defraud involving kickbacks, fee-splitting and illegal referral arrangements with unlicensed laypersons; (iii) the billed-for-services are performed and billed in order to exploit the patients for financial gain; and (iv) the billed-for-services fail to conform to the Fee Schedule and misrepresent the amount of

reimbursement to which Eclipse is entitled. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

210.    Baldassare and the Management Defendants knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

211.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,758,000.00 pursuant to the fraudulent bills submitted through Eclipse.

212.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**EIGHTH CAUSE OF ACTION**
**Against Eclipse, Baldassare and the Management Defendants**
**(Common Law Fraud)**

213.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

214.    Eclipse, Baldassare and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Radiology Services.

215.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Eclipse is properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11

NYCRR § 65-3.16(a)(12), when in fact it is unlawfully owned and controlled by non-medical professionals, and engages in a scheme involving illegal fee splitting, kickback and referral arrangements with them; (ii) in every claim, the representation that the billed-for-services are proper and properly billed, when in fact the billed-for-services are performed and billed in order to exploit the patients for financial gain; and (iii) that Eclipse is in compliance and conforms to the New York Workers Compensation Fee Schedule, when in fact, Eclipse fails to conform to the New York Workers Compensation Fee Schedule and misrepresents the amount of reimbursement to which Eclipse is entitled.

216.    Eclipse, Baldassare and the Management Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Eclipse that were not compensable under the No-Fault Laws.

217.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,758,000.00 pursuant to the fraudulent bills submitted by Defendants through Eclipse.

218.    Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

219.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**NINTH CAUSE OF ACTION**
**Against Eclipse, Baldassare and the Management Defendants**
**(Unjust Enrichment)**

220.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

221.    As set forth above, Eclipse, Baldassare and the Management Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

222.    When GEICO paid the bills and charges submitted by or on behalf of Eclipse for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

223.    Eclipse, Baldassare and the Management Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

224.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

225.    By reason of the above, Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,758,000.00.

### **JURY DEMAND**

226.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the PC Defendants have no right to receive payment for any pending bills submitted to GEICO;

B.      On the Second Cause of action against Friedman, Schliftman, Shapiro, and the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $471,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.      On the Third Cause of Action against Friedman, Schliftman, Shapiro, and the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $471,000.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against Kensington Radiology, Friedman, Schliftman, Shapiro, and the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $471,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.      On the Fifth Cause of Action against Kensington Radiology, Friedman, Schliftman, Shapiro, and the Management Defendants, more than $471,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

F.      On the Sixth Cause of Action against Baldassare and the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,758,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

G.      On the Seventh Cause of Action against Baldassare and the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,758,000.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

H.    On the Eighth Cause of Action against Eclipse, Baldassare and the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,758,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

I.    On the Ninth Cause of Action against Eclipse, Baldassare and the Management Defendants, more than $1,758,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated:  March 1, 2021
        Uniondale, New York

                            RIVKIN RADLER LLP


                            By:   */s/ Barry I. Levy, Esq.*
                                  Barry I. Levy, Esq.
                                  Michael A. Sirignano, Esq.
                                  Frank P. Tiscione, Esq.
                            926 RXR Plaza
                            Uniondale, New York 11556
                            (516) 357-3000

                            *Counsel for Plaintiffs Government Employees*
                            *Insurance Company, GEICO Indemnity Company,*
                            *GEICO General Insurance Company and GEICO*
                            *Casualty Company*